## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## JASPER DIVISION

| | |
|---|---|
| **CHERYL R. GOWEN,** } | |
| } | |
| **Plaintiff,** } | |
| } | |
| **v.** } | **Civil Action No.: 6:15-cv-00089-RDP** |
| } | |
| **CAROLYN W. COLVIN,** } | |
| **Acting Commissioner of Social Security,** } | |
| } | |
| **Defendant.** } | |

## <u>MEMORANDUM OF DECISION</u>

Plaintiff Cheryl Gowen brings this action pursuant to Sections 205(g) and 1631(c)(3) of the Social Security Act (the "Act"), seeking review of the decision of the Commissioner of Social Security ("Commissioner") denying her claims for a period of disability, disability insurance benefits ("DIB"), and Supplemental Security Income ("SSI"). *See* 42 U.S.C. §§ 405(g) & 1383(c). Based on the court's review of the record and the briefs submitted by the parties, the court finds that the decision of the Commissioner is due to be affirmed.

## I. Proceedings Below

Plaintiff applied for a period of disability, DIB, and SSI on January 3, 2008, alleging disability since January 2, 2004. (R. 254-67). After initial review, Plaintiff's applications were denied on May 6, 2008. (R. 146-57). Plaintiff then requested an administrative hearing to reconsider the denial. (R. 158). An Administrative Law Judge ("ALJ") held a hearing on May 17, 2010. (R. 44-48). On June 23, 2010, the ALJ issued a decision denying Plaintiff's claims and finding she was not disabled. (R. 120-40). Plaintiff then requested review of the ALJ's

decision.  The Appeals Council ("AC") granted Plaintiff's request, vacated the ALJ's decision, and remanded the claim for further administrative proceedings.  (R. 141-45).

The ALJ held a second hearing on October 29, 2012.  (R. 89-117).  On January 4, 2013, the ALJ issued a new decision again finding Plaintiff was not disabled.  (R. 16-37).  The AC denied Plaintiff's request for review of that decision.  (R. 8-13).  Because the AC's denial was the Commissioner's final act, this case is ripe for review.  *See* 42 U.S.C. §§ 405(g) and 1383(c)(3).

## II.    Facts

### A.    Plaintiff's Background

Plaintiff was born on March 11, 1964, and was thirty-nine years old at the time of her alleged disability onset date.  (R. 303, 371).  She completed the eleventh grade and received a GED, and has past relevant work experience as a movie store manager.  (R. 59, 111, 296, 301, 306-07, 327-28, 366, 411).  Plaintiff alleged she is disabled due to a bulging disc injury, degenerative disc disease, severe back pain, foot pain, hypertension, diabetes, bipolar disease, panic attacks, chronic obstructive pulmonary disorder ("COPD"), and depression.  (R. 108, 295, 346, 361, 365, 367).  Plaintiff claims these conditions cause both exertional and non-exertional impairments -- such as pain, loss of concentration, problems sleeping, and inability to sit, stand, or walk for long periods of time -- and prevent her from working.

### B.    Treatment by Winfield Family Medical and Dr. Farouk Raquib

From August 2004 to April 2012, Plaintiff was treated at Winfield Family Medical Clinic (primarily by Dr. Farouk A. Raquib and Charles D. Rubley, a nurse practitioner).  (R. 423-546, 582-643, 653-75, 686-710, 739-42, 799-824).  She was usually seen once or twice per month on follow-up visits.  (*Id*.).  In May 2005, Plaintiff reported that she was experiencing chronic pain

syndrome secondary to her lower back pain, chronic migraine headaches, bipolar disorder (symptomatically stable), sleep disorder, panic attacks, hypertriglyceridemia, palpitations, and long-term medicine use.  (R. 514).  Her medications then included Xanax, Phenergan, Fioricet with Codeine, Seroquel, Chlorohydrate, and Parafon Forte.  (R. 514-15).

Shortly thereafter, on July 25, 2005, Plaintiff described her pain as aching, throbbing, shooting, stabbing, sharp, tender, nagging, and miserable, and rated it on a scale as an eight out of ten.  (R. 512).  Lunesta was added to her drug regimen.  (*Id.*).  Continuous follow-up visits through June 5, 2006, noted similar complaints, and the Lunesta prescription was discontinued.  (R. 492-511).

On July 6, 2006, Plaintiff rated her pain at nine out of ten, and an examination revealed tenderness of her lumbar paraspinals.  (R. 490).  Plaintiff was prescribed Lortab and Fioricet; her Codeine prescription was discontinued.  (*Id.*).

Treatment notes dated October 18, 2006, reference a September 19, 2005 "L-spine series" showing slightly more sclerosis in the L4 vertebral body and more disc degeneration at L4/5 compared to March 2004.  (R. 507).  During her October 24, 2006 visit, Plaintiff rated her pain at seven out of ten, complained of increasing back pain, and received a prescription of Tramadol to add to her regimen.  (R. 478).  On November 1, 2006, Plaintiff complained of intractable, worsening back pain.  (R. 476). After observing her to be in a moderate degree of pain, Dr. Raquib discontinued Tramadol, increased the Lortab dosage, and prescribed Lyrica and Lidoderm patches.  (*Id.*).

Medical professionals at Marion Regional Medical Center evaluated Plaintiff on January 7, 2007, for a complaint of low back pain radiating down her right leg, and diagnosed her with chronic low back pain.  (R. 439-44).  On March 2, 2007, Plaintiff had a follow-up visit with

Nurse Rubley, and complained of increased back pain which she rated as a six on a scale of ten. (R. 466).  On March 29, 2007 Dr. Raquib saw Plaintiff again.  Again, Plaintiff complained of increasing lower back pain.  Her Lortab dosage was increased based on an observation of poor pain control and tender lumbar paraspinals.  (R. 462-63).  And, in July 2007, Plaintiff complained of pain in her right great toe and pain radiating to her right leg from her lower back. (R. 633).  Plaintiff's condition remained relatively unchanged at subsequent visits until her December 31, 2007 visit, the week after her husband died.  (R. 621-32).  She complained of anxiety and rated her pain as five on a ten-point scale.  On January 28, 2008, Dr. Raquib observed she had a depressed affect and prescribed her Ambien.  (R. 619-20).

Nikki Burleson, CRNP, saw Plaintiff in early February 2008.  (R. 617-18).  She noted Plaintiff was complaining of numbness in her legs and hips worse on the right, and ordered an MRI of her lumbar spine.  (R. 617-68).  An MRI was conducted on February 8, 2008.  Based upon the MRI results, Dr. Scott Loveless viewed Plaintiff as suffering from moderate degenerative disease and moderate to marked sclerotic degenerative endplate signal changes at L4-L5 with the overall appearance mirroring plain film findings on file from 2005, and diffuse annular bulge at L4-L5 not associated with stenosis.  (R. 642-43).  Dr. Loveless concluded Plaintiff had no disk herniations or other lumbar spine abnormalities.  (R. 643).

On March 26, 2008, Dr. Raquib was informed by Plaintiff that she had applied for permanent Social Security disability.  (R. 615).  Dr. Raquib recognized that the MRI results revealed degenerative disc disease prominent in the L4-L5 level without disc herniation.  (R. 615).  Also, Dr. Raquib noted as follows: "Chronic lumbar pain, secondary to lumbar spondylosis.  The patient is moderately incapacitated.  She is unable to do any housework secondary to pain.  Her sleep is poor.  Her functional level is borderline.  I support her

4

application for permanent disability." (*Id.*).  At Plaintiff's next follow-up, Dr. Raquib noted that she was hit on her nose by another attendee at a concert.  (R. 613).  From October 2008 to May 2009, Plaintiff's rating of her pain level on a ten-point scale fluctuated from four up to seven and eight (after doing housework), and back down to six; Zoloft and Zanaflex were added to Plaintiff's drug regimen.  (R. 583-601).  In June 2009, Plaintiff got a tattoo and complained of a higher level of pain (*i.e.*, eight out of ten), but the level dropped to six in September 2009.  (R. 667, 675).  During her October 2009 visit, Dr. Raquib noted Plaintiff had a lot of lumbar muscle spasms and prescribed Parafon Forte.  (R. 665).  Two months later, Plaintiff said she was under a lot of stress due to the passing of her father-in-law, and Dr. Raquib increased her Seroquel dosage.  (R. 661).

At Plaintiff's January 12, 2010 visit, Dr. Raquib noted she had been treated for five years, and that her disability hearing was scheduled for the following week.  (R. 659).  He also noted an impression of chronic lumbar pain, secondary to degenerative disc disease, intractable plain, and that Plaintiff indicated she has been unable to hold any job for the past five years, has difficulty sleeping secondary to pain, and cannot do "simple household chores."  (*Id.*).  Additionally, on January 12, 2010, Dr. Raquib wrote a letter describing Plaintiff's symptoms, and specifically stated that her "pain is rated as 6 out of 10 and most of the time it is 10 out of 10."  (R. 644).  He continued that, in his "clinical judgment, . . . she will be [un]able to hold any meaningful employment.  I support her fully for permanent disability status."  (*Id.*).  Subsequently, in February 2010, Plaintiff rated her pain as a five out of ten.  (R. 653).  In March 2010, Dr. Raquib discontinued Lortab and switched to Percocet.  (R. 655).  In April 2010, Plaintiff rated her pain as seven out of ten.  (R. 657).

On May 12, 2010, Dr. Raquib completed a Multiple Impairment Questionnaire ("MIQ"). (R. 645-52).[1] (Dr. Raquib provided an addendum to the MIQ on July 31, 2012, and indicated it had been completed by both a nurse's assistant and him. (R. 729)). In the MIQ, he diagnosed chronic lumbar pain/degenerative disc disease, diabetes mellitus type II, hypertension, chronic anxiety disorder, hepatic steatosis, and bipolar disorder. (R. 645-46). The MRI, and clinical findings of lumbar muscle spasm and a lowered range of motion of lumbar spine, supported these diagnoses. (*Id.*). Dr. Raquib gave Plaintiff prognoses of "poor" and "DJD on imaging studies." (R. 645). He listed the following as her primary symptoms: chronic lumbar pain; and degenerative disc disease located at L4-L5, with "constant" (estimated at an eight out of ten) pain radiating down her legs. (R. 646-47). Dr. Raquib observed that standing and bending are precipitating factors, and that Plaintiff experiences poor sleep and is unable to stand for long periods of time. (R. 647). Further, Dr. Raquib estimated that Plaintiff could only sit for two hours and stand and walk for two hours in an eight-hour work day, and that she would need to get up and move around every fifteen minutes and wait twenty minutes until sitting again. (R. 647-48). Moreover, he opined she can occasionally lift and carry up to ten pounds maximum, and that she is significantly limited in repetitively lifting. (R. 648). Plaintiff would have moderate limitations in grasping, turning, and twisting, using her fingers or hands for fine manipulations, and using her arms for reaching. (R. 648-49). Thus, in summary, Dr. Raquib opined that Plaintiff's symptoms would likely increase if she were in a competitive work environment; she is unable to keep her neck in a constant position; that her impairments will last at least twelve months and are exacerbated by stress; that she is not a malingerer; she will need unscheduled breaks from an eight-hour working day for an average of thirty-minutes rest every twenty minutes; she will have "good days" and "bad days;" she needs to avoid heights, pushing,

---

[1] A duplicate copy of the MIQ appears in the record. (R. 677-84).

pulling, kneeling, bending, and stooping; and that she is likely to miss work more than three times a month.  (R. 649-51).

In September 2010, Plaintiff rated her pain at a seven or eight out of ten with no major reported changes in her condition.  (R. 703-08).  The next month, in October 2010, Plaintiff conveyed she had fallen several times due to right leg pain, and Dr. Raquib advised her to use a cane when walking. (R. 702).  On November 3, 2010, Dr. Raquib noted again that Plaintiff applied for permanent social security disability, and she reported her pain as seven out of ten. Dr. Raquib's impression was chronic pain syndrome, sleep disorder, systemic hypertension, fatty liver, bipolar disorder, lumbar muscle spasm and intractable back pain; he also filled out a disability access parking privilege for her.  (R. 701).  Then, on November 30, 2010, Plaintiff stated she fell about a week and a half before in her home and hurt her head, hips, and lower back, but she did not go to the emergency room.  (R. 700).  Her left leg had given out and she was not using her cane.  (*Id.*).

From the end of 2010 through March 2011, Plaintiff reported that her pain level fluctuated between ten and six, and she complained of intermittent headache and neck pain following her fall.  (R. 696-99).  Dr. Raquib increased her Xanax and Percocet dosages, and suspected Plaintiff had cervical radiculopathy with symptoms of neck pain radiating to her right arm.  (R. 696, 698).  In April 2011, Plaintiff also reported making an emergency room visit the previous week due to increasing pain from her neck radiating down her right arm.  (R. 694). Movement of her cervical spine and right shoulder both resulted in pain.  (*Id.*).

In May 2011, Dr. Raquib ordered an MRI of her cervical spine and prescribed Neurontin. (R. 693-94).  The June 16, 2011 MRI revealed that disc material on the right at the C6-C7 level was prominent for narrowing and the right neural foramina and lateral recess were compatible

with small right-sided disc protrusion.  (R. 692, 709-10).  Dr. Raquib noted that throughout 2011 Plaintiff lacked medical coverage to have neurosurgical intervention, and that attempts to refer Plaintiff to a clinic in Tuscaloosa, Alabama, and UAB Hospital were unsuccessful; therefore, he referred her to a charity clinic in Tupelo, Mississippi, for additional treatment of the disc protrusion with neural impingement.[2]  (R. 687-92, 741, 800-24).  In December 2011, Dr. Raquib reduced her Xanax dosage.  (R. 815, 818).

In January 2012, Dr. Raquib further reduced Plaintiff's Xanax dosage, and noted she smokes one pack per day and has for twenty years.  (R. 810-13).  The next month, Dr. Raquib again lowered her Xanax dosage and cut down her Fioricet.  (R. 808-09).  On March 1, 2012, Plaintiff's pain was down to a four, and Dr. Raquib noted that her current opioid treatment "has been effective in controlling pain and improving level of functioning and quality of life."  (R. 800, 803).  Plaintiff's pain level was back to a six on April 26, 2012.  (R. 739-42).  Dr. Raquib submitted a letter dated July 18, 2012, which included the 2010 MIQ, and opined that Plaintiff "has intractable pain and I feel she is medically disabled."  (R. 730, 731-38).

### C.    Winfield Behavioral Health

Plaintiff attended Winfield Behavioral Health for a psychiatric evaluation upon referral from Dr. Raquib on April 11, 2012.  (R. 745-48).  Her mental status examination showed she was adequately groomed, had appropriate speech, was cooperative and had circumstantial

---

[2] Notwithstanding this referral, the administrative record contains no medical records from the Tupelo charity clinic.  Because of this missing medical evidence, the ALJ questioned Plaintiff about those visits at her hearing.  (R. 91-95).  Specifically, the ALJ recognized that Dr. Raquib had noted Plaintiff saw the neurosurgeon in March 2012 with a follow-up in May 2012, but that there were no records reflecting that visit.  (R. 91-93).  Plaintiff's attorney responded he was aware of these notations, but Plaintiff had not received any records from the doctor, and her attorney was not sure of the identity of the doctor. (R. 92).  Plaintiff testified she did not remember the name of the doctor she visited and had no records to identify her, because she was "just some lady and she, she wasn't an actual surgeon, she was like a nurse practitioner."  (R. 93, 95).  Plaintiff said she did not like the Tupelo health provider and disagreed with the practitioner's findings, based on an MRI taken approximately a year prior to Plaintiff's visit.  In particular, Plaintiff disagreed with the Tupelo provider's conclusion that the way Plaintiff's fingers were reportedly going numb did not match the manner in which her neck was injured. (R. 93).  Additionally, Plaintiff testified that she could not get a more up-to-date MRI because she lacked medical insurance and could not afford it out of pocket.  (R. 93-94).  Plaintiff indicated she decided to no longer visit the Tupelo clinic.  (R. 95).

thought, with fair judgment, good insight and concentration, was oriented to person, place, time, had no memory impairment, and was depressed with her affect congruent with her mood.  (R. 46).  The doctor determined she had a diminished capability for activities of daily living, made a clinical assessment of depression and anxiety, and prescribed her Klonopin, Celexa, and Trazodone.  (R. 747-48).  Plaintiff had a follow-up visit on May 10, 2012, where her doctor recorded a similar mental status examination, but noted that Plaintiff's thoughts were logical and her affect was appropriate.  (R. 743).  The doctor assessed her as stable and recorded a GAF score of 60.  (*Id.*).  During her second follow-up visit, on August 9, 2012, the doctor conducted the same mental status examination but now found Plaintiff's mood to be euthymic instead of depressed, assessed her to be stable, and recorded a GAF score of 60.  (R. 744).

### D. SSA Evaluations

At the Commissioner's request, on April 21, 2008, Dr. Samia Sana Moizuddin performed a physical medical evaluation of Plaintiff.  (R. 547-51).  There, Plaintiff complained of back and hip pain, numbness down her right side, right foot pain, tension headaches, diabetes, and COPD. (R. 548).  She also reported an inability to (1) sleep more than two or three hours, (2) do housework, and (3) walk long distances without pain.  (*Id.*).  Dr. Moizuddin observed Plaintiff to be cooperative, in no acute distress, and having good attention to hygiene and appearance.  (R. 549).  Further, Dr. Moizuddin observed that her gait and station examination revealed midposition without abnormalities, she could do heel walk and toe walk, and she could full squat but needed helping getting up from the squat position.  (R. 550).  The record noted that Plaintiff does not use an assistive device, and her lumbar range of motion showed forty degrees flexion, twenty degrees extension, fifty degrees left rotation and forty-five degrees right rotation.  (*Id.*). Dr. Moizuddin's impression was degeneration of lumbar or lumbosacral intervertebral disc,

headache, diabetes (without mention of complication, and controlled), COPD, generalized anxiety disorder, depression, heartburn, and tobacco abuse. (*Id.*).

Dr. Robert Estock, a state agency psychiatrist, performed a psychiatric review of Plaintiff on May 5, 2008. (R. 560-73). Dr. Estock found Plaintiff has the following non-severe impairments after considering her affective disorders and anxiety-related disorders: depression; bipolar disease; and chronic anxiety. (R. 560, 563, 565). He observed that Plaintiff's conditions appeared to be controlled by her medications. (R. 572).

### E.   Plaintiff's October 29, 2012 ALJ Hearing

At her second hearing before the ALJ, held on October 29, 2012,[3] Plaintiff testified that she is unable to work because she experiences constant pain in her neck and back. (R. 95). She stated that she "cannot walk very long or stand" more than fifteen minutes because, in the past, her leg has gone numb and gave out, causing her to fall. (R. 95-97). She also testified that she is unable to sit for more than fifteen or twenty minutes without having to change her position or stand. (R. 95-96). Plaintiff said that her pain is located in her lower back and right hip, radiates down her right leg (R. 99), and increases when she is walking, bending, squatting, turning, twisting, and standing. (R. 100, 109). Plaintiff stated she feels she can comfortably lift only the weight equivalent to a gallon of milk. (R. 109).

Plaintiff also testified she experiences chronic migraines, and that her depression prevents her from working. (R. 98, 108). She indicated she had been treated her for depression for about six months by a Dr. Scott, and he had prescribed Celexa. (R. 99). Plaintiff testified that Dr. Raquib prescribed Seroquel for her bipolar disorder, which she has taken for four or five years. (*Id.*). She also reported she has near daily tension headaches from her fall six to nine months prior, for which she takes Fioricet. (R. 108-09). Plaintiff stated she did not go to the hospital for

---

[3] The court does not address Plaintiff's May 2010 hearing as it is not the subject of this appeal.

that fall because she has no insurance and could not afford it.  (*Id.*).  Additionally, Plaintiff said she has difficulty concentrating for long (for example, she indicated it is hard for her to follow along with an entire half-hour sitcom).  (R. 106-07).

Plaintiff testified that she was not working in 2004 or 2005, but instead was caring for her terminally ill husband.[4]  (R. 100).  She stated Dr. Raquib prescribed her Zoloft at the time because she was experiencing such "extreme depression" and she could not concentrate on things.  (R. 106-07).  She also testified she then had migraines once or twice a month for which Dr. Raquib gave (and still gives) her Demerol and Phenergan.  (R. 107-08).

Plaintiff said she now mostly sits or lies on the couch each day.  (R. 97, 104).  She stated that her daughters and ten-year old granddaughters, who live with her, do housework, cleaning and laundry, and, although he is disabled, her husband cooks.  (R. 97).  She explained her husband receives disability payments, those payments are their current source of income, and they both purchase and smoke cigarettes (with Plaintiff smoking one pack a day and her husband smoking less than one pack).  (R. 94).  Additionally, her daughter leaves early for work, and her husband wakes up her grandchildren.  (R. 98).  The grandchildren ride the bus to and from school and arrive home around the same time her daughter gets home from work.  (*Id.*).  Plaintiff testified she does not often drive and can only sit in a car for about thirty minutes before she has to stretch.  (R. 105).

A Vocational Expert ("VE") also testified at Plaintiff's hearing.  (R. 110-17).  The VE answered a line of questions posed by the ALJ concerning hypotheticals based upon an

---

[4] During this time, Plaintiff said, she helped care for her ill and "difficult to handle" husband by changing his clothes, assisting him in using the toilet, giving him medications, and bathing him.  (R. 101-02).  Her only assistance, she testified, came when she called the hospice, or from her mother and brother who did the laundry and went grocery shopping.  (R. 102-04).  Plaintiff stated that, although she needed to take breaks due to pain, she "did [not] really ask for many breaks because [she] felt it was her responsibility, so [she] mainly just dealt with it."  (R. 103).

individual of Plaintiff's education, training, and work experience, who is limited to a maximum of either a light or sedentary range of work with various exertional and non-exertional limitations. (R. 111-16). She explained that Plaintiff's previously held managerial jobs were classified as light and skilled work. (R. 111). Under the ALJ's line of hypothetical questioning, the VE testified that such a person could perform a variety of jobs. Preliminarily, the VE stated that there would be some transferrable sales skills from Plaintiff's experience to a telephone solicitor position, which is sedentary and semiskilled. (R. 111-12). Then, the VE suggested that even with a limitation of light work and certain physical and non-physical limitations, Plaintiff could work both her managerial job and the transferrable-skills telephone solicitor position. (R. 112). Next, the VE explained that, with further limitations, an individual such as Plaintiff could not perform the managerial job, but could perform the telephone solicitor position, and could also work as cashier, document preparer, table worker, and order clerk jobs. (R. 113-15). These jobs would account for ranges of limited walking, standing, and sitting, with allowed rests, and concentration on tasks for two hours at a time. (*Id.*). The VE testified that when these limitations are for sedentary work and include an expectation that a worker would consistently miss two or more days per month, then no jobs would be available to someone such as Plaintiff. (R. 115-16).

The VE also answered questions posed by Plaintiff's lawyer which focused on additional limitations placed upon a hypothetical individual with Plaintiff's education, training, and work experience. (R. 116). First, the VE testified that such an individual's limitations of sitting a maximum of two hours, standing and walking a total of two hours, and the requirements of a thirty-minute break after twenty minutes of work would be job preclusive. (*Id.*). Second, the VE affirmed it would also be job preclusive if such an individual was dealing with pain, fatigue, or

other symptoms severe enough to interfere with attention and concentration on a constant basis that would put the individual off task twenty-five percent of each work hour.  (*Id.*).

## III.    ALJ Decision

Disability under the Act is determined under a five-step test.  20 C.F.R. §§ 404.1520 & 416.920.  First, the ALJ must determine whether the claimant is engaging in substantial gainful activity.  20 C.F.R. §§ 404.1520(a)(4)(i) & 416.920(a)(4)(i).  "Substantial work activity" is work activity that involves doing significant physical or mental activities.  20 C.F.R. §§ 404.1572(a) & 416.972(a).  "Gainful work activity" is work that is done for pay or profit.  20 C.F.R. §§ 404.1572(b) & 416.972(b).  If the ALJ finds that the claimant engages in substantial gainful activity, then the claimant cannot claim disability.  20 C.F.R. §§ 404.1520(b) & 416.920(b).  Second, the ALJ must determine whether the claimant has a medically determinable impairment or a combination of medical impairments that significantly limits the claimant's ability to perform basic work activities.  20 C.F.R. §§ 404.1520(a)(4)(ii) & 416.920(a)(4)(ii).  Absent such impairment, the claimant may not claim disability.  *Id.*  Third, the ALJ must determine whether the claimant's impairment meets or medically equals the criteria of an impairment listed in 20 C.F.R. § 404, Subpart P, Appendix 1.  *See* 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, & 416.926.   If such criteria are met, the claimant is declared disabled.  20 C.F.R. §§ 404.1520(a)(4)(iii) & 416.920(a)(4)(iii).

If the claimant does not fulfill the requirements necessary to be declared disabled under the third step, the ALJ may still find disability under the next two steps of the analysis.  The ALJ must first determine the claimant's residual functional capacity ("RFC"), which refers to the claimant's ability to work despite her impairments.  20 C.F.R. §§ 404.1520(e) & 416.920(e).  In the fourth step, the ALJ determines whether the claimant has the RFC to perform past relevant

work.  20 C.F.R. §§ 404.1520(a)(4)(iv) & 416.920(a)(4)(iv).  If the claimant is determined to be capable of performing past relevant work, then the claimant is deemed not disabled.  *Id.*  If the ALJ finds the claimant unable to perform past relevant work, then the analysis proceeds to the fifth and final step.  20 C.F.R. §§ 404.1520(a)(4)(v) & 416.920(a)(4)(v).  In the last part of the analysis, the ALJ must determine whether the claimant is able to perform any other work commensurate with her RFC, age, education, and work experience.  20 C.F.R. §§ 404.1520(g) & 416.920(g).  At this point, the burden of proof shifts from the claimant to the ALJ to prove the existence, in significant numbers, of jobs in the national economy that the claimant can do given her RFC, age, education, and work experience.  20 C.F.R. §§ 404.1520(g), 404.1560(c), 416.920(g), & 416.960(c).

In the first prong of the analysis, the ALJ found that Plaintiff had not engaged in substantial gainful activity since January 2, 2004, her alleged onset date of disability.  (R. 22). At step two, the ALJ found Plaintiff has the following severe impairments (within the meaning of 20 C.F.R. §§ 404.1520(c) and 416.920(c)): lumbar and cervical degenerative disc disease, chronic obstructive pulmonary disease, bipolar disorder, major depressive disorder, and generalized anxiety disorder.  (*Id.*).  Although the ALJ recognized that Plaintiff also has diabetes, migraines, and gastroesophageal reflux disease, the ALJ concluded that Plaintiff's medication controls these impairments and they cause no more than "minimal limitations."  (*Id.*).

At the third step, the ALJ determined that Plaintiff does not have an impairment or combination of impairments meeting or medically equaling a listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, and 416.926).  (R. 22).  Thus, the ALJ determined that Plaintiff has the RFC to perform a sedentary range of work with the following exertional and non-exertional limitations: she (1)

can occasionally walk and stand, two hours out of an eight-hour day; (2) can occasionally make postural maneuvers including balancing, stooping, kneeling, crouching, crawling, and climbing ramps and stairs; (3) must avoid kneeling, crawling, and climbing ladders, ropes, and scaffolds; (4) must be afforded the option to sit and stand during the work day for one to two minutes every hour or so; (5) should avoid concentrated hot/cold temperature extremes and extreme humidity; (6) must avoid work at unprotected heights and operating hazardous machinery; (7) can understand, remember, and carry out simple instruction; (8) can concentrate/remain on task for two hours at a time, sufficient to complete an eight-hour workday; and (9) is limited to jobs involving infrequent and well-explained workplace changes, with casual and non-intensive interaction with members of the general public.  (R. 23).  The ALJ considered all symptoms and their consistency with objective medical evidence and other evidence (based on 20 C.F.R. §§ 404.1529 & 416.929, and SSRs 96-4p & 96-7p), in addition to opinion evidence (in accord with 20 C.F.R. §§ 404.1527 & 416.926, and SSRs 96-2p, 96-5p, 96-6p, & 06-3p), and found Plaintiff's statements and Dr. Raquib's opinion of disability was not credible.  (R. 24-26).

The ALJ, relying on the testimony of the VE, found at step four that Plaintiff could not perform any of her past relevant work.  (R. 27).  Finally, at the fifth step of the analysis, the ALJ, again relying on the VE's testimony, found that Plaintiff could perform other jobs that exist in significant numbers in the national economy.  (R. 27-28).  Accordingly, the ALJ concluded that Plaintiff has not been under a disability, as defined in the Act, from January 2, 2004.  (R. 28).

## IV.    Plaintiff's Argument for Reversal

Plaintiff raises two arguments for reversal of the Commissioner's decision.  First, Plaintiff contends that the ALJ failed to properly weigh the medical opinion evidence and failed to properly determine her RFC.  (Doc. # 8).  In support of this contention, Plaintiff contends that

15

the ALJ provided a minimal and insufficient discussion of Dr. Raquib's treating source opinions. (*Id.*).   Second, Plaintiff asserts the ALJ failed to properly evaluate her credibility concerning subjective complaints of pain, and that the ALJ did not articulate explicit and adequate reasons for discrediting that testimony.  (*Id.*).

## V.      Standard of Review

The only issues before this court are whether the record reveals substantial evidence to sustain the ALJ's decision, *see* 42 U.S.C. § 405(g); *Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982), and whether the correct legal standards were applied.  *See Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir. 1988); *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986).  Title 42 U.S.C. §§ 405(g) and 1383(c) mandate that the Commissioner's findings are conclusive if supported by "substantial evidence."  *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990). The district court may not reconsider the facts, reevaluate the evidence, or substitute its judgment for that of the Commissioner; instead, it must review the final decision as a whole and determine if the decision is reasonable and supported by substantial evidence.  *See id*. (citing *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983)).

Substantial evidence falls somewhere between a scintilla and a preponderance of evidence; "[i]t is such relevant evidence as a reasonable person would accept as adequate to support a conclusion."  *Martin*, 894 F.2d at 1529 (quoting *Bloodsworth*, 703 F.2d at 1239) (other citations omitted).  If supported by substantial evidence, the Commissioner's factual findings must be affirmed even if the evidence preponderates against the Commissioner's findings.  *See Martin*, 894 F.2d at 1529.  While the court acknowledges that judicial review of the ALJ's findings is limited in scope, the court also notes that review "does not yield automatic affirmance."  *Lamb*, 847 F.2d at 701.

## VI.    Discussion

After careful review, the court concludes that the ALJ's decision is supported by substantial evidence and that the ALJ applied the proper legal standards.

### A.    Substantial Evidence Supports the ALJ's Evaluation of Medical Opinions

Plaintiff alleges the ALJ improperly weighed Dr. Raquib's opinion, and thus improperly determined the RCF based on lay data.  (Doc. # 8 at 13-18).  The court disagrees.  The ALJ articulated good cause for rejecting Dr. Raquib's opinion (R. 23-27), and substantial evidence supports the ALJ's findings.  *See Weekly v. Commr. of Soc. Sec.*, 486 Fed. Appx. 806, 808 (11th Cir. 2012) (*per curiam*) (citing *Moore v. Barnhart*, 405 F.3d 1208, 1212 (11th Cir. 2005) (*per curiam*) ("When the ALJ has articulated specific reasons for failing to give the opinion of a treating physician controlling weight, and those reasons are supported by substantial evidence, there is no reversible error.").

An ALJ must consider medical opinions concerning a claimant together with the other relevant evidence in the record.  20 C.F.R. §§ 404.1527(b), 416.927(b).  Among other relevant factors, when considering how much weigh to afford a medical opinion, the ALJ should consider the length and nature of the treatment relationship, the frequency of examination, the support provided in a medical opinion, the medical opinion's consistency with the record, the physician's specialization, and other factors a claimant brings to the ALJ's attention.  20 C.F.R. §§ 404.1527(c), 416.927(c); *see also Hearn v. Commr., Soc. Sec. Admin.*, 619 Fed. Appx. 892, 895 (11th Cir. 2015).  The ALJ "may reject the opinion of any physician when the evidence supports a contrary conclusion."  *Bloodsworth*, 703 F.2d at 1240.  Furthermore, a treating physician's opinion "need not be given substantial weight when there is 'good cause,' to the contrary, meaning that the opinion was not bolstered by the evidence, the evidence supported a contrary

finding, or the treating physician's opinion was conclusory or inconsistent with the doctor's own medical records." *Hearn*, 619 Fed. Appx. at 895 (citing *Phillips v. Barnhart*, 357 F.3d 1232, 1240-41 (11th Cir. 2004)); *see also Winschel v. Commr. of Soc. Sec.*, 631 F.3d 1176, 1179 (11th Cir. 2011) (quoting *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997), *Phillips*, 357 F.2d at 1240-41) (citing 20 C.F.R. §§ 404.1527(d)(1)-(2), 416.927(d)(1)-(2)).[5] With good cause, an ALJ may disregard a treating physician's opinion so long as the ALJ clearly articulates her reasoning. *Winschel*, 631 F.3d at 1179 (citing *Phillips*, 357 F.3d at 1241); *accord Owens v. Heckler*, 748 F.2d 1511, 1516 (11th Cir. 1984) (*per curiam*) (an ALJ must "state with at least some measure of clarity the grounds for his decision"). Although medical opinions can contribute to an ALJ's decision, it is emphatically the Commissioner, not a physician, who has the final responsibility to decide whether an individual meets the statutory definition of disability. 20 C.F.R. §§ 404.1527(d), 416.927(d); *see also* SSR 96-5P, 1996 WL 374183, at *2 (July 2, 1996).

In this case, the ALJ rejected Dr. Raquib's opinion that Plaintiff is disabled and can only perform a less than sedentary range of work more restrictive than the RFC. (R. 26, 730-38). In rejecting that opinion, the ALJ found that, despite Dr. Raquib's long-time status as Plaintiff's treating physician, his opinion was not supported by his own treatment notes. (R. 26). For example, Dr. Raquib opined that Plaintiff's "pain is rated as 6 out of 10 and most of the time it is 10 out of 10." (R. 644). The record very rarely contains any evidence where Plaintiff rated her pain as a ten on a scale of ten. The ALJ noted instead that the treating notes "evidence routine, conservative treatment with minimal positive objective findings upon examination, and [are]

---

[5] The Commissioner promulgated revised regulations in 2012, which moved subsection (d) of 20 C.F.R. §§ 404.1527 and 416.927 to subsection (c). *See* How We Collect and Consider Evidence of Disability, 77 Fed. Reg. 10651, 10656-57 (Feb. 23, 2012). The amendment was purely technical; the relevant language of the regulations remained the same.

inconsistent with the other medical evidence of record, including the benign findings upon examination by Dr. Moizuddin."  (R. 26).

"The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight [the ALJ] will give that opinion."  20 C.F.R. §§ 404.1527(c)(3) & 416.927(c)(3).  The ALJ observed that Plaintiff's numerous visits to Winfield Neurology Family Medicine were for receiving prescription refills.  (R. 25).  Moreover, the ALJ observed Plaintiff was frequently treated by a nurse practitioner rather than Dr. Raquib. (*Id.*).  And, the ALJ noted that the record only evidences minimal objective findings by these medical professionals.  (*Id.*).  To be sure, the ALJ candidly noted the presence of objective medical evidence in support of the RFC, and found that evidence supported the assessed RFC, including the following: the September 19, 2005 x-rays of Plaintiff's lumbar spine which revealed sclerosis in the L4 vertebral body and disc degeneration at L4-L5 (*see* R. 507, 643);[6] the February 28, 2008 MRI demonstrating degenerative disc disease prominent at the L4-L5 level not associated with stenosis and without disc herniation or other spine abnormalities (R. 642-43); and the June 6, 2011 MRI of Plaintiff's cervical spine revealing right-sided disc protrusion at C6-C7 with narrowing lateral recess and neural foramina (R. 692, 709-10)).  (R. 24).  But, the ALJ also recognized that the treatment records rarely showed positive signs limited to subjective complaints of paraspinals tenderness, pain with range of motion, occasional paraspinals spasms, and fair air entry to the lungs upon physical examination.  (R. 25; *see* R. 692-95, 703).  Instead, Plaintiff admitted to "doing well" during multiple office visits.  (R. 25). Additionally, the ALJ observed that, despite Plaintiff's exhibition of signs of a cervical spine

---

[6] After many reviews of the record, the court was unable to locate medical evidence dated September 19, 2005, or x-rays from that time.  However, an October 18, 2005 treatment note and the February 28, 2008 MRI records discuss a plain film series from September 19, 2005, revealing findings consistent with the ALJ's statement.

disorder in mid-2011, treatment notes from early 2012 show these signs were absent upon physical examination.[7] (*Id.*).  And, Dr. Raquib stated that Plaintiff's drug treatment was effective in controlling pain and improving her quality of life.  (*Id.*; R. 803).  In any event, the treatment notes do not make findings concerning many of Dr. Raquib's assessments in the MIQ.

Further, the ALJ pointed to other evidence in the record that simply do not support Dr. Raquib's opinion, namely Dr. Moizuddin's findings.[8]  (R. 25-26) ("The benign findings upon consultative examination by Dr. . . . Moizuddin [] are consistent with the records from Winfield Neurology Family Medicine.").  For instance, Dr. Moizuddin observed that Plaintiff had a normal gait and station, and, while she needed help rising from a full squat, she could heel/toe walk.  (R. 550).  The only abnormality Dr. Moizuddin noted was a limited range of motion in the lumbar spine.  (*Id.*).  This evidence contradicts Dr. Raquib's opinion;[9] rather, it is consistent with Winfield Neurology Family Medicine's treatment notes.

Thus, the ALJ complied with applicable regulations when considering and had good cause for rejecting Dr. Raquib's opinion.  *See* 20 C.F.R. §§ 404.1527 & 416.927; *Hearn*, 619 Fed. Appx. at 895.  The ALJ "articulated specific reasons" for her decision, and pointed to

---

[7] Moreover, Dr. Raquib included the 2010 MIQ with his 2012 opinion of disability.  (R. 730-38).  Although he references Plaintiff's cervical spondylosis and radicular pain of right arm in his opinion letter, the details of that opinion (*i.e.*, the MIQ) fail to mention cervical issues and date to before Plaintiff's cervical injury.  (*See id.*).

[8] The ALJ also gave little weight to the opinion of Dr. Estock, the state agency psychological consultant, because he failed to "adequately consider" Plaintiff's subjective complaints, and did not review the treatment notes from Winfield Behavioral Health Center.  (R. 26-27).

Regardless, the ALJ recognized that Plaintiff relied upon Dr. Raquib, her primary care physician, for prescription medications to relieve mental health symptoms (which appeared to be successfully managed by these drugs).  (R. 25).  The record reflects minimal formal mental health treatment.  As for the two 2012 formal treatment records, the ALJ noted that the treating psychiatrist's diagnosis and GAF scores of 55 and 60 support the mild to moderate limitation of functioning in the assessed RFC.  (R. 26).

[9] Additionally, the ALJ determined that Dr. Raquib's opinion is inconsistent with Plaintiff's reported daily activities, although the ALJ's discussion of those activities is more pertinent to the ALJ's determination of Plaintiff's credibility.  (R. 25-26).

specific medical facts.  *Moore*, 405 F.3d at 1212; *see also* SSR 96-8p, 1996 WL 374184, at *7 (July 2, 1996).  Substantial evidence supports the ALJ's evaluation.

**B.     The ALJ Gave Proper Weight to Plaintiff's Subjective Testimony and Properly Considered Plaintiff's Claims**

Plaintiff also argues that the ALJ's discounting of Plaintiff's subjective complaints is not supported by substantial evidence.  (Doc. # 8 at 18-20).  Again, the court disagrees.  The ALJ articulated valid reasons for finding Plaintiff not fully credible (R. 24-26), and substantial evidence supports the ALJ's findings.  *See Allen v. Sullivan*, 880 F.2d 1200, 1202-03 (11th Cir. 1989) ("If an ALJ rejects a claimant's testimony regarding pain, he must articulate specific reasons for doing so.").

An ALJ must rely upon substantial evidence in discrediting a claimant's subjective pain testimony.  *Hale v. Bowen*, 831 F.2d 1007, 1011-12 (11th Cir. 1987) (the ALJ "must articulate explicit and adequate reasons" for rejecting a claimant's testimony).  If an ALJ fails to do so, as a matter of law, she has accepted the claimant's subjective testimony as true.  *Id.* at 1012.  When a claimant attempts to prove disability based on her subjective complaints, she must provide evidence of an underlying medical condition and either objective medical evidence confirming the severity of her alleged symptoms or evidence establishing that her medical condition could be reasonably expected to give rise to her alleged symptoms.  *See* 20 C.F.R. §§ 404.1529(a)-(b), 416.929(a)-(b); SSR 96-7p, 1996 WL 374186 (July 2, 1996); *see also Wilson v. Barnhart*, 284 F.3d 1219, 1225-25 (11th Cir. 2002) (citing *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991)).  If the objective medical evidence does not confirm the severity of the claimant's alleged symptoms, but the claimant establishes she has an impairment that could reasonably be expected to produce her alleged symptoms, the ALJ must evaluate the intensity and persistence of the claimant's alleged symptoms and their effect on her ability to work.  *See* C.F.R. § 404.1529(c)-

21

(d); SSR 96-7p; *Wilson*, 284 F.3d at 1225-26.  In determining whether substantial evidence supports an ALJ's credibility determination, "[t]he question is not . . . whether [the] ALJ could have reasonably credited [claimant's] testimony, but whether the ALJ was clearly wrong to discredit it."  *Werner v. Commr. of Soc. Sec.*, 421 Fed. Appx. 935, 939 (11th Cir. 2011).

Here, the ALJ found that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, [her] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible."  (R. 24). The ALJ evaluated Plaintiff's subjective complaints and concluded that *both* the objective medical evidence and Plaintiff's daily activities do not support her complaints.  (R. 24-25); *see* 20 C.F.R. §§ 404.1529(c), 416.929(c); SSR 96-7p.

The ALJ recognized that, based on Plaintiff's subjective complaints, Dr. Raquib provided only "conservative" treatment with pain medication that was noted to have improved her level of functioning and quality of life.  (R. 25).  Additionally, Plaintiff made inconsistent statements to her treating doctors and nurses.  For instance, over the course of her visits (that is, a few months), she would state that her lower back pain was worsening, but she rated that pain as a lower number on the ten-point scale than she had assigned it before.  (R. 466, 476, 478, 490). Moreover, the ALJ noted that Dr. Moizuddin's consultative examination revealed "benign findings," which further diminished Plaintiff's credibility.  (R. 25). And, concerning her mental health complaints, the ALJ stated that while Plaintiff saw Dr. Raquib for medication, she rarely visited a mental health professional.  (R. 25-26).  Substantial evidence in the medical record as a whole supports the ALJ's findings that Plaintiff's statements of pain are less than credible because those statements are inconsistent with the medical treatment findings.  *See* SSR 96-7p.

The ALJ also found that Plaintiff's activities of daily living less than credible.[10]  (R. 26).  *See* 20 C.F.R. §§ 404.1529(c)(3)(i), 416.929(c)(3)(i); *see also Macia v. Bowen*, 829 F.2d 1009, 1012 (11th Cir. 1987).  The ALJ observed that Plaintiff twice testified to caring for her late husband from 2000 to 2007 by, among other things, feeding him, administering his medication, changing his clothes, and bathing him.  (R. 26, 52, 101).  Plaintiff also admitted she tries to go to clubs with friends, although she has a hard time trying to dance.  (R. 320).  Additionally, Dr. Raquib's April 26, 2008 treatment notes report that Plaintiff was hit on her nose at a concert.  (R. 613).  Moreover, Plaintiff complained about her ability to sit for long, but testified that she mostly sits or lies on the couch all day.[11]  (R. 97, 104).  Considering the record in its entirety, substantial evidence supports the ALJ's findings.  *See Dyer v. Barnhart*, 395 F.3d 1206, 1211 (11th Cir. 2005) (holding there is not a "rigid requirement that the ALJ specifically refer to every piece of evidence in his decision, so long as the ALJ's decision, as was *not* the case here, is not a broad rejection which is 'not enough to enable [the district court . . .] to conclude that [the ALJ] considered'" the claimant's medical condition as a whole) (quoting *Foote v. Chater*, 67 F.3d 1553, 1561 (11th Cir. 1995) (changes and emphasis in *Dyer*); *see also* 42 U.S.C. §§ 405(g) & 1383(c); *Martin*, 894 F.2d at 1529.

## VII.   Conclusion

The court concludes that the ALJ's determination that Plaintiff is not disabled is supported by substantial evidence and the proper legal standards were applied in reaching this

---

[10] The ALJ also found Plaintiff's sporadic work history further diminished Plaintiff's credibility because it raised a question concerning whether her "current unemployment is truly the result of her medical condition."  (R. 26).  Plaintiff alleges this finding was erroneous.  (Doc. # 8 at 20).  Although the ALJ's observation is speculative (but, perhaps not without reason) the court need not address this question because substantial evidence supports the ALJ's credibility determination without that consideration.

[11] Plaintiff gave conflicting answers in her March 11, 2008 Physical Activities Questionnaire (*e.g.*, stating on one page she cannot drive more than twenty minutes without having to stop and walk, and stating on another that she hurts if she drives more than thirty minutes).  (R. 335-430).

determination.  The Commissioner's final decision is therefore due to be affirmed.  A separate

order in accordance with this memorandum of decision will be entered.

**DONE** and **ORDERED** this March 25, 2016.

**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE